IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:18-CR-00267-BSM |
| | ) | |
| JONATHAN STACY BERRIER | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS AND/OR MOTION FOR *DENNO* HEARING**

The United States of America, by and through United States Attorney Cody Hiland, and Assistant United States Attorney Kristin Bryant, for its response to defendant's motion to suppress states (Doc. No. 33):

**I.     Background**

On April 3, 2017, a relative (Relative-1) of a 13 year old minor female (Minor-1) contacted the FBI in Arkansas and reported that Minor-1 was being enticed into sexual activity by an adult male about 62 years of age residing in North Carolina. In March of 2017, Relative-1 overheard multiple telephone conversations between Minor-1 and an adult male. The conversations included discussions about meeting and having sex.

On April 18, 2017, a package addressed to Minor-1, mailed via the United States Postal Service, arrived at Relative-1's residence and was intercepted by Relative-1. At the time, Minor-1 was staying with Relative-1. The return address written on the package was "Jessica B, 78 W 9th St, Lexington, North Carolina 27295".[1] The package contained multiple items, including boxes of candy and empty water bottles. An Alcatel cell phone was hidden inside one of the boxes of candy. Relative-1 gave the package to the FBI. The cell phone had not been activated.

---

[1] Based on surveillance, agents do not believe 78 W 9th St, Lexington, NC 27295 is an actual address.

1

On May 2, 2017, a package addressed to Minor-1, mailed via the United States Postal Service, arrived at Relative-1's residence and was intercepted by Relative-1. Again, at the time, Minor-1 was staying with Relative-1. The return address was written as follows, "Jessica Berry, 70 W 8th St, Lexington, NC 27295." The package contained multiple items including candy, Jell-O, a Winnie the Pooh bear, and a $10 bill. A Samsung cell phone was hidden in one of the boxes of candy. Relative-1 again gave the package to the FBI. The cell phone had not been activated.

On May 4, 2017, law enforcement reviewed Minor-1's Facebook profile and observed that a user with a profile name "Barry John" had posted on Minor-1's Facebook page.

On May 9, 2017, Minor-1 was interviewed by an FBI Child/Adolescent Forensic Interviewer (CAFI). Minor-1 disclosed that she was in contact with a "Jonathan BERRIER" from North Carolina via his cell number, (336) 300-9326. She claimed that she had never seen him and that she was friends with his 14-year-old sister Jessica. She disclosed that she also used Facebook to communicate with him and that his Facebook display name is "Barry John." When shown a picture of Jonathan Stacy BERRIER of Lexington, North Carolina, Minor-1 claimed that she did not know who he was.

In May of 2017, Minor-1 provided three G-mail addresses that she used to communicate with "Jonathan BERRIER." The email addresses were different combinations of Minor-1's first name and "John." On May 18, 2017, your Affiant logged into the emails via the password Minor-1 provided and reviewed their contents. According to Minor-1, the email addresses were created by "Jonathan BERRIER" for them to correspond as both had the email address and password. Minor-1 stated that they didn't use them very much. Minor-1 stated that she mostly communicated with "Jonathan BERRIER" via Facebook, telephone conversations, and video chat.

On July 5, 2017, Minor-1 was interviewed by FBI Special Agent (SA) Johnson. Minor-1 admitted that she lied to the CAFI about her relationship with "Jonathan BERRIER" and about not recognizing his picture. She explained that she lied because she was scared. Minor-1 admitted that the individual in the picture shown to her by FBI was the "Jonathan BERRIER" she had been referring to and that she had been in contact with BERRIER for five or six months. The following is information provided by Minor-1 during the interview:

- She first met BERRIER on Facebook Messenger around January 2017.

- She spoke with BERRIER on his cell phone (336) 300-9326.

- They talked about meeting up in person.

- BERRIER would bring up "inappropriate" and "sexual" conversations.

- They would talk almost every day and would sometimes video chat.

- BERRIER'S birthday is May 19th.

- BERRIER lives in Lexington, North Carolina, with his father.

- BERRIER knew she was 13 years old because Minor-1 told him her true age.

- BERRIER said he was 36 years old but later admitted he was 49 years old.

- Because Minor-1 did not have a cell phone, she was using her home telephone and friend's cell phones to communicate with BERRIER. BERRIER attempted to mail her cell phones, but she never received them.

- BERRIER showed her his penis five or six times on FaceTime, Apple's video chat application.

- BERRIER requested that she send him nude pictures of herself.

- She sent BERRIER two nude pictures of herself, one of her breasts and one of her vagina.

On March 1, 2018, the Davidson County Sheriff's Office in North Carolina provided a copy of a 1999 incident report (report number 99002549). The report alleges that BERRIER sexually assaulted an 8-year-old female in 1999 by rubbing her vagina with his hands. As a result of the report, on July 8, 1999, BERRIER was arrested for felony First Degree Statutory Sex Offense and misdemeanor Indecent Liberties. A review of BERRIER'S National Crime Information Center (NCIC) criminal history revealed that BERRIER was convicted of misdemeanor Assault on a Child under 12 (N.C.G.S. § 14-33(c)(3)) on January 9, 2002.

On March 1, 2018, a second relative (Relative-2) discovered Minor-1 had a secret Cricket cell phone. Minor-1 refused to say where she got the phone from and refused to give the passcode to access the phone. According to Relative-2, Minor-1 stated, "I don't want you to look at this phone because I contacted that man." Relative-2 understood Minor-1 to be referring to BERRIER. Also recovered from Minor-1 was an expired North Carolina driver's license of "Jonathan Stacey BERRIER", issued by the Department of Motor Vehicles on June 18, 1990.

On March 9, 2018, FBI SA Tara Cataldo executed a federal search warrant at BERRIER'S residence, 70 West 8th Street, Lexington, North Carolina 27295. BERRIER was not home at the time. A laptop, a LG mobile phone, numerous DVDs, a thumb drive, and a Cricket mobile phone box were seized. These items were subsequently reviewed for evidence. The laptop contained BERRIER'S Facebook username, john.berrier.96. This username had the profile name of "John Berry" which is a variation of what Minor-1 admitted she used to communicate with BERRIER. Facebook profile names can be changed by the user whenever they want to change them, however, the username remains constant. The mobile phone contained clothed pictures of Minor-1.

The same day the search warrant was executed, March 9, 2018, SA Cataldo spoke with BERRIER via his cell phone, (336) 300-9326. BERRIER said the FBI would not find anything on

4

his laptop because he only uses it to watch YouTube. He also said the LG mobile phone that was seized from the residence was his previous mobile phone when he used T-Mobile. He now uses Cricket.

On April 6, 2018, SA Cataldo contacted Facebook and requested the Facebook username john.berrier.96 be preserved pending a search warrant. Facebook complied and issued case number 1623298.

On April 20 and 23, 2018, BERRIER spoke with Relative-2 and a third relative of Minor-1's (Relative-3) and stated to both that he was in contact with Minor-1. On April 20, 2018, administrators at Minor-1's school observed that Minor-1 was in email contact with BERRIER via Minor-1's school email address.

On April 25, 2018, BERRIER contacted SA Cataldo via telephone from (336) 300-9326. He asked why SA Cataldo had visited his residence on April 20, 2018. SA Cataldo advised that she would like to talk with him. He asked if the FBI would supply an attorney for him, and SA Cataldo told BERRIER that the FBI does not supply attorneys. He then said he would not talk to SA Cataldo without an attorney present. SA Cataldo advised him to cease all contact with Minor-1 and Minor-1's family. BERRIER said he was worried for Minor-1's safety because she claimed that she was going to run away from home. Further, BERRIER admitted he was in contact with Minor-1, and admitted to contacting Minor-1's relatives.

On or about April 19, 2018, Minor-1 advised Relative-2 that she deliberately became pregnant and wanted to keep the baby but refused to divulge who the father was. On or about that same date, Minor-1 began experiencing a spontaneous miscarriage. The pregnancy and resulting miscarriage were confirmed by medical personnel via blood tests and ultrasounds. On April 26, 2018, Minor-1 told Relative-2 that on March 16, 2018, BERRIER drove his white Tahoe to

Arkansas and picked up Minor-1. Minor-1 confessed that she and BERRIER had sexual intercourse. On April 27, 2018, Minor-1 admitted to Relative-2 that BERRIER was the father of the baby that she miscarried. Relative-2 advised that Minor-1 skipped school on March 16, 2018.

BERRIER'S neighbor informed SA Cataldo that BERRIER drives a white Tahoe. According to the North Carolina Division of Motor Vehicles, BERRIER'S father owns a white GMC Yukon. GMC Yukons and Chevrolet Tahoes have very similar appearances.

On May 4, 2018, Relative 2 contacted law enforcement and stated that she believed BERRIER was outside of their residence. She observed a white Tahoe with a North Carolina license plate. SA Johnson drove to Minor 1's residence and observed the Tahoe. The license plate of the vehicle returned to BERRIER's father.

SA Johnson followed the vehicle to a local café where he made contact with BERRIER and his sister. SA Johnson, alone, approached BERRIER and his sister and identified himself by showing his credentials. SA Johnson instructed BERRIER to leave Minor 1 alone. BERRIER stated he wished to speak with SA Johnson if they (BERRIER and SA Johnson) could step outside in the parking lot of the café. BERRIER's sister remained in the restaurant. BERRIER stated that he was in Arkansas to investigate who posed a true danger to Minor 1. BERRIER stated that he was going file for an Order of Protection against the true threat to Minor 1. SA Johnson asked BERRIER if he had sex with Minor 1, and he denied having sexual intercourse with her. BERRIER was asked if he knew Minor 1 was pregnant, and he stated that Minor 1 told him that she had a miscarriage. BERRIER then asked SA Johnson several times if Minor 1 was still pregnant. SA Johnson asked BERRIER if he took Minor 1 to the mall in in Jonesboro and BERRIER stated that he did. SA Johnson asked BERRIER if he thought it was appropriate for a strange man to take a 14-year-old girl to the mall, and BERRIER would not answer the question.

BERRIER was asked what was in the package that he mailed to Minor 1. BERRIER stated that he mailed multiple items including candy, Jell-O, a stuffed teddy bear, a cell phone, and $10.00. BERRIER was later asked how he communicated with Minor 1 and he stated that they would log in to the account ijohnnygumball@yahoo.com and leave messages to each other in the drafts section.

BERRIER further stated that he had been in contact with Minor 1 since she was 13. He described one occasion when he was communicating with Minor 1 via webcam for over an hour and a half just observing how well her grandparents treated her and loved her. BERRIER also stated that he purchased and gave Minor 1 a recording device and camera to install in her bedroom to capture proof that her step-dad was abusing her, which he claims Minor 1 told him.

At that time, SA Johnson and BERRIER ended their discussion, and BERRIER left with his sister in his vehicle and said they were going to go to the Marion District Court. Surveillance was maintained on BERRIER's vehicle and SA Johnson followed them to the Crittenden County Courthouse. SA Johnson exited his vehicle and approached BERRIER. BERRIER told SA Johnson that he accidentally traveled to the wrong courthouse and should have gone to the Marion District Court. At this time, BERRIER was taken into custody. SA Johnson asked BERRIER if he would turn over his cellular telephone. BERRIER's sister provided the phone to SA Johnson. SA Johnson asked BERRIER if he could have the passcode and BERRIER stated, "for you I will." BERRIER gave SA Johnson the code "1579" to unlock the phone. SA Johnson did not ask BERRIER any more questions.

BERRIER began telling SA Johnson that law enforcement looked at him in a negative light because of an old charge or allegation. BERRIER further insisted on showing SA Johnson how BERRIER and Minor 1 communicated on the phone through draft documents of emails using

7

email account ijohnnygumball@yahoo.com. BERRIER stated he and Minor 1 had passwords to log-in to the account and they would type messages to each other. SA Johnson told BERRIER that he could not look through his phone without consent or a search warrant.

BERRIER further told SA Johnson, without any questions being asked by SA Johnson, that he had been in contact with Minor 1 since she was 13-years old. BERRIER described one occasion when he was communicating with her on webcam for over an hour-and-a-half just observing how well her grandparents treated her and loved her. BERRIER stated he used that to keep Minor 1 from running away from home on one occasion. BERRIER stated Minor 1 made some allegations of abuse against her step-father. Over the course of a year-and-a-half, BERRIER stated he asked Minor 1 the same questions over and over again to see if he would get the same answers. BERRIER stated he gave Minor 1 an "out" if she was not being truthful with him. BERRIER state he purchased and gave Minor 1 a recording device and camera to install inside her bedroom to capture proof of the allegations against her step-dad.

SA Johnson was able to obtain copies of the emails exchanged between Minor 1 and BERRIER using johnnygumball@gmail.com. The following email exchange took place between Minor 1 and BERRIER on April 19, 2018:

> Minor 1: the phones kinda gone . . . my mom almost had a cop search me I couldn't get out of that situation
>
> Minor 1: and I can't get on facebook so do not text me on there
>
> BERRIER: so the cop got the phone
>
> Minor 1: no mama does. He was just there in case I wasn't gonna give it up. I heard them say something about tasking and I didn't wanna get tased and they search me . . . im sorry . . I screwed up

Minor 1:    u best know im gonna get it back though lol

BERRIER:    is everything hidden . . . calculator?

Minor 1:    it should be yeah

[Later in the conversation]

BERRIER:    so your moms pissed the f b eye hasn't arrested me . . and how she out for blood . . .? Why she brought a cop to take the phone?

Minor 1:    idk . . . she knows how upset ive been lately too . . . im gonna try to call u later on her phone. And let her listen

Minor 1:    cause I told her how I felt about u and how u were whats kept me happy the past few months ive been home and even before that. I told her that phone was the only thing I had left to talk to the one person that made my happy.

On April 20, beginning at 8:01 am, the following exchange took place:

BERRIER:    I miss you so much . . I see your beautiful face in my mind constantly . . Im not going to give up as long as you never give up . . Just me and you . . No other guys no other girls . . . Im focused on just you.  I hope and pray you will stay faithful to me . . I will be faithful to you.

Minor 1:    Awe babe I miss u too. And I promise that its just us and I will stop at nothing to be your forever

BERRIER:    you still have another phone?

Minor 1:    no

Minor 1:    she has the phones . . ill get them back though

BERRIER:    How did she get both phones?  I told you to keep one at your moms and one at nana's

9

Minor 1:     I told u one was takin before

BERRIER:     Dam hun . . . U better be glad you're the most beautiful girl in this galaxy . . Or id be gone

Minor 1:     lol. I love u so much

BERRIER:     Honey I love you please stop adding these guys you out of 16 more guys please stop it please delete them

Minor 1:     I haven't been on facebook

BERRIER:     Then these guys are accepting your friend requests that YOU sent them . . . please stop

[Later in the email conversation]

Minor 1:     but they can send requests too

BERRIER:     Yes they can send request but that arnt added to your friends list until you accept then . . . Stop accepting friend requests from guys and stop sending guys friends requests

Minor 1:     ok ill stop accepting them

BERRIER:     scence you haven't been online these are guys that to sought out . . . Am I good enough for you hun . . . Why do you need other guys attention?

Minor 1:     your all I need bby

Minor 1:     I don't need there attention

BERRIER:     Then you don't need to contact them or be in contact with them . . . They don't belong on your friends list . . If Im really all you need . . Delete them now

[later in the email conversation]

10

    BERRIER:    you have to be 18 years old to get a plane ticket or a bus ticket and have ID HOH

[later in the email conversation]

    BERRIER:    you don't love me

On June 6, 2018, the defendant was charged in a two-count Indictment with enticement of a minor, in violation of Title 18, United States Code, Section 2422(b), and traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a minor, in violation of Title 18, United States Code, Section 2423(b).

On April 20, 2020, the defendant filed the instant Motion to Suppress and/or Motion for *Denno* hearing.

## II.  Authority

In his Motion, the defendant "moves the Court to suppress any statements made by him" because they were made without proper *Miranda* warnings and were involuntary. As discussed above, the defendant made two separate statements to SA Johnson. The first statement was made outside the café and the defendant left on his own accord after making the statement (hereinafter referred to as the "first statement"). The second statement was made after his arrest, but was not made in response to any questioning by SA Johnson (hereinafter referred to as the "second statement").

As it relates to the "first statement," the statement was non-custodial; therefore, the *Miranda* warnings were not required. The second statement was spontaneous and not in response to interrogation. Suppression is not warranted.

### A.     The defendant's first statement was non-custodial.

Police officers are not required to administer *Miranda* warnings to every person they question. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Rather, *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), requires only that law enforcement officers must read a person certain warnings before subjecting the person to "custodial interrogation."[2] Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *United States v. Flores–Sandoval,* 474 F.3d 1142, 1146 (8th Cir. 2007) (quoting *Maine v. Thibodeau,* 475 U.S. 1144, 1146, 106 S.Ct. 1799, 90 L.Ed.2d 343 (1986)). The ultimate inquiry is "whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (quoting *United States v. Black Bear,* 422 F.3d 658, 661 (8th Cir. 2005)).

In making this determination, there are "two discrete inquiries . . . : first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (citing *Thompson v. Keohane,* 516 U.S. 99, 112 (1995) (footnote omitted)). This inquiry focuses on the objective circumstances of the interrogation, not on "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam); *United States v. Johnson*, 619 F.3d 910, 918-19 (8th Cir. 2010).

---

[2] Those rights include: (1) You have the right to remain silent; (2) Anything you say can and will be used against you in a court of law; (3) You have the right to talk to a lawyer during questioning; and (4) If you cannot afford to hire a lawyer, one will be appointed to represent you if you request one. *Miranda*, 384 U.S. at 478-79.

12

The Eighth Circuit has identified six non-exclusive factors for determining whether a suspect is in custody:

> whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "These six indicia are not exclusive, and 'a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." 289 F.3d 496, 500-501 (8th Cir. 2002).

In this case, the defendant's statement made outside of the café was during a consensual encounter, during which the defendant was free to leave at any time. The defendant was the one who chose to speak to SA Johnson outside of the café and made the suggestion to do so.

As to the second factor, whether the defendant possessed unrestrained freedom of movement during questioning, the defendant was not in handcuffs and was free to leave whenever he wished. In fact, after the interview concluded, the defendant got in his vehicle with his sister and left. Furthermore, the defendant's statements were indicative that he wanted to answer SA Johnson's questions and wanted to clear up any misunderstanding.

The third factor, whether the defendant initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions, is the most dispositive in this case. In *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002), the Eighth Circuit reversed the district court's suppression of a defendant's statement finding that the defendant was not in custody during interrogation. In analyzing the third factor, the Court found that the defendant's conduct during

13

the hearing supported a finding of voluntary acquiescence where the defendant testified at the suppression hearing that he would have answered any questions asked by the agents because he believed it was in his best interest to appear friendly and cooperative. *Id*. at 501-02. The Court noted that the defendant offered to show agents which computer contained child pornography and other items. *Id*. at 502. Here, the defendant wanted to speak with SA Johnson and discuss Minor 1. The defendant told SA Johnson that he would speak with him as long as they could step outside, which they did.

There is no evidence or assertions in the defendant's Motion that officers employed strong arm tactics or deceptive stratagems. Thus, the fourth factor weighs in favor of a finding that the interview was non-custodial.

As to the fifth factor, there is no evidence it was a police-dominated atmosphere. SA Johnson was the only law enforcement officer present during the first statement. In *Axsom*, the Eighth Circuit found that the district court erred in finding the atmosphere of questioning was police dominated. 289 F.3d at 502. There, although there were nine agents and specialists in the defendant's small house executing the search warrant, only two agents conducted the interview. *Id*. The defendant smoked a pipe in a chair inside the house while agents sat across from him. *Id*. The Court stated, "[w]hile execution of the search warrant was certainly police-dominated, the interview between the two agents and Axsom was not." *Id*. The interview between SA Johnson and BERRIER outside of the café was not police dominated.

Lastly, while the defendant was ultimately arrested, this factor alone is not dispositive. Whether the suspect was placed under arrest at the termination of questioning does not alone "establish that the interview was custodial." *United States v. Giboney*, 863 F.3d 1022, 1028-29 (8th Cir. 2017). In *Flores-Sandoval*, the Eighth Circuit determined the defendant was not in

custody during an interview conducted on the sidewalk outside the jail where he had been detained for over one year, even where the defendant was arrested after admitting he was in the country illegally during that interview. 474 F.3d 1143-44. In *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005), the Eighth Circuit found that because the officer did not "articulate his plan to arrest" the defendant and told the defendant he did not intend to arrest him, the officer's intention to arrest the defendant did "not affect the question of whether [the defendant] was in custody during the interrogation." (citing *Griffin*, 922 F.2d at 1356; *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). In this case, the defendant was not arrested after the first statement and left in his own vehicle.

In short, the defendant was not "in custody" and no reasonable person would have felt he was not at liberty to terminate the interview and leave. Because the first interview with SA Johnson was consensual, or in the alternative, non-custodial, the defendant's argument that his statement was involuntary because he was not given his *Miranda* warnings should be rejected.

**B.    The defendant's second statement was spontaneous and not in response to police interrogation**

The defendant appears to allege that the spontaneous and unprompted statements he made after being placed under arrest were subject to *Miranda* and therefore should not be admissible. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), "prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his fifth amendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005). "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *Id*. (citing *United States v. Hawkins,* 102 F.3d 973, 975 (8th Cir. 1996). "An officer's request for clarification of a

15

…

spontaneous statement generally does not constitute interrogation." *Id*. (citing *Butzin v. Wood,* 886 F.2d 1016, 1018 (8th Cir. 1989); *United States v. Koontz,* 143 F.3d 408, 411 (1998)).

The second statement made by BERRIER was not in response to police interrogation and should not be suppressed.

      C.      Voluntariness

It appears that the defendant is requesting a hearing regarding the voluntariness of the defendant's statements. The United States acknowledges that it must prove by a preponderance of the evidence that the challenged statements were voluntary. *United States v. Astello,* 241 F.3d 965, 966 (8th Cir. 2001). "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *Id*. at 967 (quoting *United States v. Kilgore*, 58 F.3d 340, 353 (8th Cir. 1995)). In making this determination, the Court considers the totality of the circumstances in assessing the conduct of law enforcement officials and the defendant's capacity to resist pressure to confess. *Id*. However, the Eighth Circuit has recognized that "[o]bviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession. In order to obtain the desired result, interrogators use a laundry list of tactics." *Id*. at 967.

The Eighth Circuit has noted, "one of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (quoting *Wilson v. Lawrence County,* 260 F.3d 946, 952 (8th Cir. 2001)). The Eighth Circuit has generally "concluded that where the defendant possessed at least average intelligence, then his inculpatory

16

statements were not compelled." *Id*. (citing *United States v. Gallardo–Marquez,* 253 F.3d 1121, 1123–24 (8th Cir.) (concluding confession was voluntary where defendant was of average intelligence and had prior contact with law enforcement), *cert. denied,* 534 U.S. 1031, 122 S.Ct. 570, 151 L.Ed.2d 443 (2001); *Astello,* 241 F.3d at 968 (concluding that confession of an eighteen-year-old was voluntary where he had completed eleventh grade and possessed a capacity to understand what was being said during the interview); *Simmons v. Bowersox,* 235 F.3d 1124, 1134 (8th Cir. 2001) (concluding that confession was voluntary where defendant had full scale I.Q. of 88); *cf. Wilson,* 260 F.3d at 949 n. 4 & 952–53 (finding involuntary confession where defendant was mentally retarded, his overall mental abilities were in the bottom two percent of the population, and testimony revealed that he could be "talked into anything")). "[C]oercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (holding defendant's statement was voluntary where officer testified defendant "was responsive in answering questions, knew where he was, what was going on, and what was happening, and provided details about the crimes") (citing *Colorado v. Connelly,* 479 U.S. 157, 165–67 (1986)).

There is no allegation in the defendant's motion that his statements were extracted by threats, violence, or direct or implied promises, or that his will was overborne and his capacity for self-determination critically impaired. The defendant has failed to allege coercive police activity. The defendant has not alleged that he lacks intelligence, that his mental state was impaired, and has failed to suggest any other factor that makes him particularly suggestible or susceptible to having his will overborne. Also, this was not the defendant's first encounter with law enforcement, as evidenced by his criminal history. Considering the totality of the circumstances, the conduct of law enforcement officials and the defendant's capacity to resist pressure, the Court should find

that the defendant's statements were voluntary.

To the extent the defendant intends to rely on 18 U.S.C. § 3501 by alleging his statements were not voluntary, the United States notes that subsection (d) of Section 3501 provides, "Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at a time at which the person who made or gave such confession was not under arrest or other detention." The defendant's first statement occurred prior to the defendant's arrest or detention, and the second statement was spontaneous and not response to interrogation. *See United States v. Lambros*, 564 F.2d 26, 31 (8th Cir. 1977) (holding that an informal statement to a cellmate "although incriminating in effect, by terms of § 3501(d) do not trigger the procedures mandated by § 3501(a)).

### D. Hearing

The Court's Pretrial Order for Criminal Cases provides that the "Court will deny an evidentiary hearing on suppression motions that are supported only by general or conclusory assertions founded on mere suspicion or conjecture." The defendant's motion is less than two pages long, and contains no specific factual allegations that would support suppression. Instead, the defendant makes the conclusory allegation that his statement was involuntary and implies that *Miranda* warnings were required.

To avoid unfair surprise, and considering the resources and time necessary to prepare for and conduct a suppression hearing, the United States respectfully requests that the Court require the defendant to supplement his motion with sufficiently definite, specific, detailed, and nonconjectural facts to enable the court to conclude that contested issues of fact exist prior to any hearing in this case.

### E.   Suppression Generally

"[E]xclusion has always been our last resort, not our first impulse, and [Supreme Court] precedents establish important principles that constrain application of the exclusionary rule." *Herring v. United States,* 129 S.Ct. 695, 700 (2009) (internal citations and quotation marks omitted). As a judicially-created remedy, the exclusionary rule applies only where "its remedial objectives are thought most efficaciously served." *Arizona v. Evans,* 514 U.S. 1, 11 (1995). The exclusionary rule is not an individual right, but it "applies only where it 'results in *appreciable deterrence.*' " *Herring,* 129 S.Ct. at 700 (quoting *United States v. Leon,* 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)) (emphasis added) (some internal marks omitted); *see also Penn. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 368, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) ("We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.").

The Court also balances the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.' " *Herring,* 129 S.Ct. at 701 (quoting *Leon,* 468 U.S. at 908, 104 S.Ct. 3405). Finally, the Supreme Court includes "an assessment of the flagrancy of the police misconduct" in its calculus of whether the exclusionary rule should be applied. *Id.* (internal marks omitted). *United States v. Hamilton*, 591 F.3d 1017, 1027–28 (8th Cir. 2010). Here, there was no constitutional violation, and even if there were, there was no bad faith or flagrant police misconduct. Suppression is not appropriate.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the defendant's motion.

                              Respectfully Submitted,

                              CODY HILAND
                              United States Attorney


                              _____
                              By: KRISTIN BRYANT (2009156)
                              Assistant U.S. Attorney
                              P.O. Box 1229
                              Little Rock, AR  72203
                              501-340-2600
                              Kristin.Bryant@usdoj.gov